**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARCUS M., <br><br> Plaintiff, <br><br> v. <br><br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | Civil Action No. 22-6212 (SDW) <br><br> **OPINION** <br><br> November 6, 2023 |

**WIGENTON**, District Judge.

Before this Court is Plaintiff Marcus M.'s ("Plaintiff")[1] appeal of the final administrative decision of the Commissioner of Social Security ("Commissioner") with respect to Administrative Law Judge ("ALJ") Ricardy Damille's ("ALJ Damille") denial of Plaintiff's claim for a period of disability and supplemental security income ("SSI") under the Social Security Act (the "Act"). This Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Venue is proper under 28 U.S.C. § 1391(b). This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, this Court finds that ALJ Damille's factual findings are supported by substantial evidence and that his legal determinations are correct. Therefore, the Commissioner's decision is **AFFIRMED**.

---

[1] Plaintiff is identified only by his first name and last initial in this opinion, pursuant to Chief District Judge Freda Wolfson's Standing Order 2021-10, issued on October 1, 2021, available at https://www.njd.uscourts.gov/sites/njd/files/SO21-10.pdf.

I.      **PROCEDURAL AND FACTUAL HISTORY**

     A.      **Procedural History**

On May 3, 2019[2], Plaintiff applied for SSI (D.E. 4 (Administrative Record ("R.")) at 207), alleging disability beginning on April 7, 2016 ("onset date"), due to Klinefelter Syndrome, back injury, osteoporosis skeletal bone syndrome, micro adenoma pituitary tumor, depression, and post-traumatic stress disorder ("PTSD").  (R. 64, 243.)  The Social Security Administration ("SSA") denied Plaintiff's application initially on September 17, 2019, and upon reconsideration on October 22, 2019.  (R. 95–99, 101–03.)  ALJ Damille held an administrative hearing on April 27, 2021 (R. 35), where Plaintiff amended his onset date to May 3, 2019 ("amended onset date")—the date of his application for SSI.  (R. 16, 40.)  On June 15, 2021, the ALJ issued a written decision denying Plaintiff's application and found that Plaintiff was not disabled.  (R. 13–27.)  The Appeals Council denied review on August 22, 2022 (R. 1–6), making the ALJ's decision the Commissioner's final decision.  *See* 20 C.F.R. § 416.1455.  Plaintiff thereafter timely filed the instant appeal in this Court, and the parties completed briefing.  (D.E. 1, 4, 9, 14.)

     B.      **Factual History**

          *i.      Medical Records*

On April 12, 2018, about a year before Plaintiff applied for SSI, Plaintiff saw Dr. Thomas Steineke ("Dr. Steineke") for a neurosurgical consultation.  (R. 398.)  Dr. Steineke found Plaintiff to have a history of Klinefelter Syndrome, a small pituitary microadenoma, and an elevated prolactin level for which he took Cabergoline.  (Id.)  On examination, Plaintiff was awake, alert, oriented times three, and not in distress; his weight was 225 pounds, and his BMI

---

[2] The Record provides two different dates for when Plaintiff filed his application—May 3, 2019 (*see e.g.*, R. 16) and May 6, 2019.  (*See e.g.*, R. 207.)  For the sake of consistency, this Opinion will refer to May 3, 2019 as the date Plaintiff filed his application.

was 31.61.  (Id.)  He had fluent speech and no "focal motor, sensory, coordination, or gait deficits." (Id.)  He "denie[d] significant headaches, blurred vision, double vision, loss of vision, loss of smell, weakness, numbness, paresthesias [sic], dysesthesias [sic], difficulty with concentration or memory or any other neurological symptoms."  (Id.)

Dr. Steineke noted that the MRI showed stability of Plaintiff's pituitary area and that there may not be an adenoma.  (Id.)  He concluded that Plaintiff was "doing very well undergoing treatment with [C]abergoline," with normalized prolactin level and decreased headaches.  (Id.)  Dr. Steineke concluded that no surgical intervention was necessary, and he would continue to do an annual follow-up visit and MRI scan for Plaintiff.  (Id.)

On September 4, 2019, less than four months after Plaintiff filed his application, Dr. Ernesto Perdomo ("Dr. Perdomo") performed a psychological evaluation of Plaintiff.  (R. 441.)  At the time of the evaluation, Plaintiff was five feet and eleven inches and weighed 215 pounds. (Id.)  He reported having nightmares and flashbacks about the abuse in county jail and feeling depressed, tired, fatigued, and having no interest, motivation, or energy.  (Id.)  According to Dr. Perdomo, Plaintiff was never on any psychotropic medication or treatment.  Plaintiff denied any alcohol or drug abuse history, other than occasional marijuana use and social drinking.  (Id.)

Dr. Perdomo noted that Plaintiff was very depressed and that his short-term memory was "mildly impaired" as he was not able to repeat five or six digits forward.  (R. 441–42.)  Dr. Perdomo found that Plaintiff's long-term memory was good, his concentration was fair, his intelligence was within the average range, and he was able to understand and follow instructions. (R. 442–43.)  Dr. Perdomo diagnosed Plaintiff with PTSD and depression and stated that Plaintiff's conditions may last more than one year and may affect his ability to function effectively.  (R. 443.)

On January 22, 2020, Plaintiff was voluntarily admitted to Trinitas Regional Medical Center ("Trinitas") for a psychiatric evaluation following an altercation with his mother. (R. 452–53, 470.) On examination, Plaintiff weighed 240 pounds. (R. 454.) He reported feeling depressed and having auditory hallucinations, fatigue, and confusion. (R. 470.) He spoke about the assaults he experienced when he was in jail which caused him to suffer from symptoms of PTSD, such as "flashbacks, nightmares, being fearful, and being hypervigilant." (R. 470, 479.) Plaintiff's insight and judgment were impaired; his mood was anxious; and his thought process was irrational. (R. 462, 464, 477, 481.) Trinitas' records indicated that Plaintiff was no longer on treatment for pituitary adenoma by January 2020. (R. 470.)

During his admission at Trinitas, Plaintiff was oriented, alert, and responsive. (R. 462.) He had no problems with his perception or speech. (R. 455, 462.) His attention span was within normal limits and his memory was intact. (R. 462, 494, 509.) He denied suicidal ideation, pain, and discomfort. (R. 462, 464, 477.) His thought process became organized. (R. 481, 491, 494.) His physical examinations were unremarkable with good strength in the upper and lower extremities; he had no edema and no gross musculoskeletal abnormalities. (R. 489.) He was "[f]riendly and sociable with peers." (R. 503.)

During his hospitalization, Plaintiff was given Risperidone and Seroquel because he had anxiety and trouble sleeping. (R. 542.) Dr. Hitendra Patel ("Dr. Patel") stated that she "did not appreciate [Plaintiff's] hallucination" because "many of his symptoms were not consistent with his presentation." (Id.) Dr. Patel stated that Plaintiff spent most of the time playing cards and games with other patients and did not have any episodes of inappropriate or aggressive behavior. (Id.) At discharge, Plaintiff was awake, alert, and oriented; his speech was normal; his thought process was linear, logical, and goal-directed; and he denied suicidal or homicidal ideation. (Id.)

4

Plaintiff's insight and judgment were fair, and his impulse control was improving. (Id.)

Immediately after Plaintiff was discharged from Trinitas, he attended an Adult Partial Hospitalization Program through Trinitas where he received group therapy, individual therapy, and psychiatric medication management. (R. 550, 557–75.) Plaintiff was prescribed Seroquel and Abilify to continue to stabilize his symptoms. (R. 550.) Plaintiff completed the Adult Partial Hospitalization Program on March 31, 2020 and was transferred to Trinitas' outpatient program where he received weekly group therapy, monthly individual therapy, and psychiatric medication management. (R. 551.) At this time, Plaintiff reported good sleep, good appetite, and no depression; he interacted well with people and denied any impulsive or dangerous behavior; his mood was stable; and he had no irritability. (R. 606.)

In June 2020, Plaintiff saw Dr. Andrew So, at Garden State Pain Control for trigger point injections for his neck and lower back pain. (R. 577–97.) Plaintiff described intermittent sharp pain in the neck and back area, which interfered with walking, but denied having headaches, mood disorder, sleep disturbances, or psychosocial stressors. (R. 577–78.) Dr. So stated that Plaintiff's neck and back pain began in 2012. (R. 577.) An MRI of Plaintiff's cervical spine showed mild cervical spondylosis, superimposed on a congenitally narrow cervical spinal canal. (R. 587, 594.) An MRI of his lumbar spine showed minimal degenerative changes. (R. 587, 595.) Dr. So noted a seventy-five percent improvement in Plaintiff's back and neck pain in his follow-up visit report from September 2020, over a year after his amended onset date.

    ii.  *July 2019 Functional Report*

In July 2019, two months after Plaintiff applied for SSI, he described in the functional report to the SSA his "daily activities" as cleaning his room, looking for work, helping his neighbors, walking his dog, and preparing his own meals. (R. 268–70.) Plaintiff also reported

5

engaging in other activities, such as doing laundry, cutting grass, and shopping for water, food, clothes, and personal items. (R. 270.) Plaintiff said he did not drive due to a suspended license, but he could travel by foot, use public transit, and ride a bicycle. (R. 272.) In addition, he said he likes to play basketball and soccer with his friends, read books, and play chess. (Id.) Plaintiff reported having headaches, blurry vision, and trouble sleeping, and feeling depressed, weak, and unwell (R. 278–73), but he could follow both written and spoken instructions. (R. 273.)

### iii. April 2021 Administrative Hearing

At the administrative hearing on April 27, 2021, Plaintiff testified that he stopped working after he was fired from his last job on April 12, 2019, as a sanitation worker for the City of Linden. (R. 40–41.) He was terminated because he was wearing headphones at work to block out the voices in his head (R. 40–41, 43), thereby creating a safety concern for his employer. (R. 50.) Before that, he worked as a delivery driver, a paper deliverer, and a security guard. (R. 41.)

According to Plaintiff, "his problems" started when he was incarcerated in county jail from 2012 to 2016 awaiting trial on felony charges. (R. 43–44.) He was acquitted at trial, but during his incarceration, he was assaulted by correctional officers which caused him injury in his back and mental trauma. (R. 44–45.) He had been having nightmares about the assaults and heard voices that made it hard for him to concentrate. (R. 45–46.) Plaintiff was hospitalized for in-patient psychiatric treatment[3] and then released to a partial outpatient program where he went every day to receive therapy and medication, including Hydroxyzine Pamoate and Sertraline, for two months. (R. 46–47.) After his hospitalization, he received monthly injections of Abilify from his healthcare provider for his PTSD, bipolar disorder, and depression. (R. 47–48.) He testified that while the medication helped with his anxiety and depression, he continued to hear

---

[3] The hearing transcript incorrectly states Plaintiff was psychiatrically hospitalized in January 2000. (R. 39.)

6

voices.  (R. 47.)  Plaintiff stated that the voices and the PTSD are the primary reasons why he is unable to work.  (R. 54–55.)

At the time of the hearing, Plaintiff alternated living at his mother's house and a friend's house.  (R. 51.)  He testified that during the day, he watched television, went for a short walk but could not go farther than around the corner because of his back pain, and cooked for himself.  (Id.)  He did not go out often because he felt paranoid in public, but he accompanied his mother to dine out sometimes.  (R. 52.)  He also saw a friend every couple of weeks.  (Id.)  He stated that he was unable to help his mother with house chores because the medication he was on caused him to be drowsy and sometimes gave him a headache.  (R. 53.)

Based on Plaintiff's testimony, Vocational Expert Kenneth Smith ("VE Smith") testified that an individual with the same characteristics and limitations as Plaintiff can perform light work, such as housekeeping/cleaner, small products assembler, and price marker.  (R. 57–58.)

## II.     LEGAL STANDARD

### A.     Standard of Review

This Court exercises plenary review of the legal issues decided by the ALJ.  *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011).  However, this Court's review of the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions.  42 U.S.C. § 405(g) ("The findings of the [agency] . . . as to any fact, if supported by substantial evidence, shall be conclusive[.]"); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019).  This Court is "not permitted to re-weigh the evidence or impose [its] own factual determinations."  *Chandler*, 667 F.3d at 359.  If the ALJ's decision is supported by substantial evidence, sufficiently explained, and not based on legal error, this Court may not set aside the decision "even if [this Court] would have decided the factual inquiry differently."  *Hartranft v.*

*Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *see* 42 U.S.C. §§ 405(b)(1), (g).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154 (quotation marks omitted). It is "a term of art used throughout administrative law" and notwithstanding "the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Id.* (quotation marks omitted). "It is more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Zirnsak v. Colvin*, 777 F.3d 607, 610–11 (3d Cir. 2014) (quotation marks omitted). However, a "single piece of evidence 'will not satisfy the substantiality test if the Commissioner ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion.'" *Nazario v. Comm'r Soc. Sec.*, 794 F. App'x 204, 209 (3d Cir. 2019) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

To allow for meaningful judicial review, an ALJ must adequately consider and assess the persuasiveness of relevant medical evidence, and explain the reasons for his decision, on the record. 42 U.S.C. § 405(b)(1); 20 C.F.R. § 416.920c; *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001).[4] "Where there is conflicting probative evidence," there is "a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions," and failure to provide that explanation warrants remand. *Fargnoli*, 247 F.3d at 42. However, "the ALJ is free to accept

---

[4] Under regulations effective March 27, 2017, the ALJ is no longer required to state what "weight" he gives any piece of evidence or to give the treating physician's opinion controlling weight. *See* 20 C.F.R. § 416.1520c; *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017). Instead, the ALJ must "articulate . . . how persuasive" it finds each medical source's opinion and any prior administrative medical findings. 20 C.F.R. § 416.1520c(b). The ALJ is not required to discuss the persuasiveness of nonmedical evidence or to analyze evidence that is "inherently neither valuable nor persuasive," including statements on issues reserved for the ALJ to decide, such as whether a claimant is or is not able to work. *Id*. §§ 416.920b(c), 416.920c(d).

some medical evidence and reject other evidence, provided that he provides an explanation for discrediting the rejected evidence." *Zirnsak*, 777 F.3d at 614.

### B. The Five-Step Disability Test

A claimant will be considered disabled under the Act if the claimant is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" lasting continuously for at least twelve months. 42 U.S.C. § 1381c(a)(3). The impairment must be severe enough to render the claimant "not only unable to do his previous work but [unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A). The Commissioner must consider "all evidence" in the record, but the claimant's statements alone are insufficient to establish a disability; there must also be objective "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques" showing an impairment that "could reasonably be expected to produce the pain or other symptoms alleged." *Id*. §§ 423(d)(5)(A)–(B).

To make a disability determination, the ALJ follows a five-step, sequential analysis. 20 C.F.R. § 416.920(a); *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 201–03 (3d Cir. 2019). "The burden of proof is on the claimant at all steps except step five, where the burden is on the [ALJ]." *Hess*, 931 F.3d at 201. If the ALJ determines at any step that a claimant is or is not disabled, the ALJ does not proceed to the next step. 20 C.F.R. § 416.920(a)(4).

Step one requires the ALJ to consider the claimant's work activity, if any, and determine whether the claimant is engaging in substantial gainful activity ("SGA"). 20 C.F.R. § 416.920(b). SGA is defined as work that "[i]nvolves doing significant and productive physical or mental duties . . . for pay or profit." *Id*. § 416.972(a)–(b). If the claimant engages in SGA, the claimant

9

is not disabled for purposes of receiving social security benefits, regardless of the severity of the claimant's impairments. *Id*. § 416.920(a)(4)(i). If the claimant is not engaging in SGA, the ALJ proceeds to step two.

At step two, the ALJ determines whether the claimant suffers from a "severe" and "medically determinable" impairment or combination of impairments that has lasted or is expected to last for a continuous period of at least twelve months. *Id*. § 416.920(c). An impairment or combination of impairments is "severe" only if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id*. Any impairment must be established by objective medical evidence and not the claimant's statements alone. *Id.* § 416.921. If a severe impairment or combination of impairments is not found, the claimant is not disabled. *Id*. § 416.922. If the ALJ finds a severe impairment or combination of impairments, the ALJ proceeds to step three.

At step three, the ALJ determines whether the claimant's impairment or combination of impairments is equal to, or exceeds, one of those included in the Listing of Impairments ("Listing") in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. § 416.920(a)(4)(iii). If any of the claimant's impairments or a combination of impairments meets the statutory criteria of a listed impairment as well as the duration requirement, the claimant is disabled and entitled to benefits. *Id.* § 416.909. If not, the ALJ proceeds to the next step.

Before undergoing the analysis at step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). *Id*. § 416.920(e). RFC is the most the claimant can do despite his limitations in terms of meeting the "physical, mental, sensory, and other requirements of work." *Id*. § 416.945(a)(1), (a)(4). The ALJ considers all impairments in this analysis, not just those deemed severe. *Id*. § 416.945 (a)(2).

At step four, the ALJ determines whether the claimant can still do his past relevant work, *Id.* § 416.945(a)(5)(i), by comparing his RFC to the "physical and mental demands" of that work. *Id*. § 416.960(b) (defining past relevant work). If the claimant can do that kind of work, he is not disabled under the Act. *Id*. §§ 416.920(a)(4)(iv), 416.960(b)(3). If not, or if there is insufficient evidence to make a finding, the ALJ proceeds to the fifth and final step.

At step five, the ALJ must determine whether the claimant "can make an adjustment to other work," considering his RFC, age, education, and work experience. *Id*. §§ 416.920(a)(4)(v), (g). Unlike in the first four steps of the analysis, where the claimant bears the burden of persuasion, at step five the SSA is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [the claimant's RFC] and vocational factors." *Id*. § 416.960(c). If the claimant is unable to make an adjustment to other work, he or she is disabled. *Id*. § 416.920(a)(4)(v).

## III. DISCUSSION

### A. The ALJ's Decision

On June 15, 2021, ALJ Damille issued a decision concluding that Plaintiff was not disabled from the amended onset date through the date of the decision. (R. 13–27.) At step one, the ALJ found that Plaintiff had not engaged in SGA since the amended onset date. (R. 18.) At step two, he found that Plaintiff had the following severe impairments: mild cervical spondylosis; minimal degenerative changes of the lumbar spine; obesity; micro adenoma pituitary tumor; depression; bipolar disorder; anxiety; and PTSD. (R. 18–19.) At step three, the ALJ concluded that Plaintiff's impairments, individually and in combination, did not meet or medically equal the severity of any Listing.[5] (R. 19.) The ALJ also noted that "although there is no specific medical

---

[5] Plaintiff does not challenge the ALJ's listings analysis, so it is not discussed in this opinion.

11

listing regarding obesity, [he has] evaluated the impairment herein pursuant to the extensive and detailed guidelines set forth in [Social Security Ruling ("SSR")] 19-2p." (R. 19–20.)

ALJ Damille found that Plaintiff "ha[d] the residual functional capacity to perform light work" subject to some limitations.[6] (R. 21.) At step four, the ALJ concluded that Plaintiff had no past relevant work. (Id.) At step five, the ALJ relied on VE Smith's testimony and the Dictionary of Occupational Titles to find that, "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform," such as "housekeeping/cleaner," "small products assembler," and "price marker." (R. 27.) Therefore, ALJ Damille concluded that Plaintiff was not disabled under the Act during the relevant period. (R. 23.)

**B.  Analysis**

On appeal, Plaintiff seeks reversal or remand of ALJ Damille's decision. (D.E. 9 at 5–7.) He raises two arguments: first, the ALJ did not give sufficient consideration of his obesity in step three of the disability analysis; and second, the ALJ did not adequately explain how he made the RFC assessment. This Court considers the arguments in turn and finds each unpersuasive.

       *i.  The ALJ's Consideration of Obesity in Step Three and Subsequent Steps*

Plaintiff argues that ALJ Damille did not meaningfully consider the effects of his obesity, either individually or in combination with his other impairments, on his workplace function at step three.[7] This argument has no merit as the ALJ meaningfully considered and discussed the

---

[6] ALJ Damille's RFC finding stated that Plaintiff

> can occasionally climb ramps and stairs but never climb ladders, ropes and scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. He must avoid concentrated exposure to vibration and hazards such as machinery and heights. He is able to understand, remember and carry out simple instructions. He is restricted to work involving few if any [workplace] changes and occasional decision making. He cannot work in tandem with coworkers and he can have no interaction with the public.

(R. 21.)

[7] Plaintiff never alleged that obesity was an impairment that significantly limited his ability to work until he appealed

12

effects of Plaintiff's obesity on his workplace function.

"[A]n ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009). In assessing the impact of claimant's obesity, the ALJ must discuss the evidence and explain his reasoning in a manner that would be "sufficient to enable meaningful judicial review." *Id.* However, an ALJ need not "use particular language or adhere to a particular format in conducting his analysis." *Jones v. Barnhart*, 364 F. 3d 501, 505 (3d Cir. 2004).

While Plaintiff focuses merely on the ALJ's step three analysis, the Third Circuit has stressed that an ALJ's decision must be "read as a whole." *Id.*; *see also Rivera v. Comm'r of Soc. Sec.*, 164 F. App'x 260, 263 (3d Cir. 2006) (finding ALJ's conclusory statement in step three was harmless where, "in reviewing the voluminous medical evidence available to us, we found abundant evidence supporting the position taken by the ALJ, and comparatively little contradictory evidence").

In this case, ALJ Damille's decision, read as a whole, demonstrates that he considered all relevant evidence in concluding that Plaintiff did not have an impairment or combination of impairments that meet the requirements for any Listing. First, ALJ Damille evaluated obesity pursuant to SSR 19-2p, and considered how obesity may affect Plaintiff's "musculoskeletal, respiratory, cardiovascular, and endocrine disorders." (R. 19–20.) The ALJ "fully considered obesity in the context of the overall record evidence" in making his findings in step three. (R.

---

the ALJ's decision. At the hearing, the ALJ listed the impairments that he was to consider, which did not include obesity, and asked Plaintiff's counsel: "Are there other impairments that you would like me to consider?" (R. 38.) Plaintiff's counsel replied: "That pretty much is the main ones, Judge. We'll bring up anything else[;] . . . all the symptomatology stems from them." (Id.) Nevertheless, the ALJ found Plaintiff's obesity a severe impairment at step two. (R. 18–19.)

20.) Subsequently, ALJ Damille discussed in detail Plaintiff's obesity, BMI, and physical conditions in assessing his RFC—for example, the ALJ noted Plaintiff's BMI but also found that he "retained normal strength in his upper and lower extremities" and that "his sleep and back pain were both improving." (R. 23–25.)

ALJ Damille also considered Plaintiff's obesity in evaluating the medical opinions. In determining Plaintiff's physical impairments, the ALJ found that "[a]lthough the record confirms that [Plaintiff] has cervical and lumbar issues and obesity, the findings of the MRI's are relatively mild and [Plaintiff] has not received significant treatment." (R. 25.) The ALJ's discussion of obesity constitutes meaningful consideration of Plaintiff's obesity as required by *Diaz*.

Moreover, Plaintiff bears the burden, but fails to point to any evidence, to show how further consideration of obesity by ALJ Damille would have changed the outcome of the case. *Rutherford v. Barnhart*, 399 F.3d 546, 552–53 (3d Cir. 2005) (holding that a remand is not required where obesity was not adequately considered but "it would not affect the outcome of the case"). In other words, Plaintiff has not identified any medical evidence that his obesity caused any additional functional limitation that was not fully considered by the ALJ. *See e.g.*, *Cosme v. Comm'r of Soc. Sec.*, 845 F. App'x 128, 132 (3d Cir. 2021) (holding that a "generalized response" that obesity would affect another impairment is insufficient to warrant remand (citing *Rutherford*, 399 F.3d at 553)). Therefore, this Court finds that ALJ Damille fully considered Plaintiff's obesity in step three and subsequent steps and his analysis was supported by substantial evidence.

## ii. The ALJ's Analysis of Plaintiff's RFC

Plaintiff argues that ALJ Damille's evaluation of Plaintiff's RFC was deficient for two reasons. First, Plaintiff asserts that the ALJ's determination of Plaintiff's RFC was not based on the substantial evidence of the record. Second, Plaintiff claims that the ALJ did not

sufficiently explain how he arrived at his RFC findings, as required by SSR 96-8p. The ALJ, however, made his RFC findings based on substantial evidence and provided adequate explanation.

A claimant's RFC is the most that the claimant can do despite his limitations. 20 C.F.R. §§ 416.945(a)(1), (a)(4). The RFC assessment is based on all of the relevant evidence, including the medical records, medical opinions, and the claimant's subjective allegations and description of his own limitations. *See* 20 C.F.R. § 416.927(d)(2); *see also Chandler*, 667 F.3d at 361. Generally, at step four the ALJ assesses the claimant's RFC and whether the claimant can perform his "past relevant work." *See Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007); *see also* 20 C.F.R. § 416.945(a)(5)(i). Therefore, in making an RFC determination, "the ALJ must consider all evidence before him." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. § 416.945(a)(1). Once the ALJ has made this determination, this Court's review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. *See Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002).

After reviewing the record, this Court finds that the ALJ's determination of Plaintiff's RFC is based upon substantial evidence. The ALJ discussed in detail Plaintiff's treatment history, examination findings, medical opinions, and the testimony of Plaintiff and his mother over five pages (R. 21–26). After a thorough analysis of the relevant evidence, ALJ Damille concluded that Plaintiff has the RFC to perform light work, as defined in 20 C.F.R. §

416.967(b),[8] with limitations.[9]  (R. 21.)

The medical records, medical opinions of health care providers, and Plaintiff's and his mother's testimony provide substantial evidence in support of the ALJ's determination that Plaintiff is able to do "light work."  (R. 21–26); *see Zirnsak*, 777 F.3d at 612 ("[A]n ALJ can consider evidence from non-medical sources to determine the severity of a claimant's impairments and how those impairments impact the claimant's ability to work.").  Specifically, ALJ Damille found Dr. Perdomo's opinion, the testimony of Plaintiff's mother, and the opinions of Disability Determination Services persuasive as they are consistent with the medical evidence.  (R. 25.)

For example, Plaintiff's mother testified that Plaintiff "does chores around the house," "helps the neighbors with chores," is "independent with personal care," is "able to shop for snacks, water, and clothing," and enjoys "playing basketball, football, video games, chess, working out, and listening to music."  (R. 22; see R. 252–54.)  She also stated that Plaintiff has "issues getting along with people due to his anxiety and PTSD" and "limitations with lifting, bending, standing, walking, climbing stairs, seeing, completing tasks, concentrating, understanding, [and] following instructions. . . ."  (R. 22.)  Her testimony supports the ALJ's determination that Plaintiff can perform light work with some limitations.

The ALJ also discussed Dr. Perdomo's psychological evaluation of Plaintiff in

---

[8] "Light work" is defined in 20 C.F.R. § 416.967(b) as:

> involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 416.967(b).

[9] *See supra,* note 5.

16

September 2019.  The ALJ found that while Plaintiff reported having nightmares and flashbacks of the assaults he experienced in jail, Plaintiff also reported spending his day cleaning the house, playing with the dog, and taking care of his personal needs and hygiene.  (R. 24, 441–42.)  In addition, the ALJ incorporated into his analysis Dr. Perdomo's evaluation stating that Plaintiff is "able to understand and follow instructions" (R. 25, 442), and, while his short-term memory was "mildly impaired," his long-term memory was good.  (R. 24, 442.)  Dr. Perdomo's opinion is consistent with Plaintiff's medical record and the ALJ's RFC findings.

In sum, the ALJ's RFC determination was based on substantial evidence in the record and sufficiently explained.

## IV.    CONCLUSION

For the foregoing reasons, this Court finds that ALJ Damille's factual findings were supported by substantial evidence in the record and that his legal determinations were correct.  The Commissioner's decision is therefore **AFFIRMED**.  An appropriate order follows.


s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:  Clerk
cc:    Parties